**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

RED BRICK PARTNERS-BROKERAGE,
LLC (formerly known as
"THE STAUBACH COMPNAY-NORTH
FLORIDA, LLC"),

    Plaintiff,

vs.                                                Case No. 4:08cv82-SPM-WCS

THE STAUBACH COMPANY,

    Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART TO COMPEL
ARBITRATION AND STAY LITIGATION PENDING ARBITRATION**

This cause comes before the Court on Defendant's motion to compel arbitration and stay litigation pending arbitration (doc. 8), Plaintiff's response (doc. 12), Defendant's reply (doc. 19), and Plaintiff's surreply (doc. 20). At issue is whether the arbitration provision in the Sublicense Agreement (doc. 8-2) applies to the claims arising out of the Separation Agreement (doc. 8-4). Also at issue is whether the mechanism adopted in the Revenue Sharing Agreement (doc. 8-3) ("Section 1H") qualifies as arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16.

## I. Introduction

Defendant, The Staubach Company, is based in Dallas, Texas and is one of the largest commercial real estate firms in the country. During the period of time of Plaintiff's allegations, Defendant offered a wide range of services to its clients through various licensees and sublicensees. Licensees had exclusive rights over large territories and the ability to sell sublicenses to entities which sought to sell Defendant's services in small areas within those territories.

Effective July 10, 2003, Plaintiff entered into a Sublicense Agreement with Defendant's licensee, The Staubach-Company-Florida Holdings ("FH"), based in North Carolina, in order to provide real estate brokerage services to North Florida[1] under the Staubach brand. The Sublicense Agreement contained an arbitration provision which stated in relevant part:

> It is agreed that any claim or controversy between [Defendant] TSC or Sublicensor . . . and [Plaintiff] Sublicensee . . . arising out of, or relating to any course of conduct, transaction, or occurrence involving TSC or Sublicensor or Sublicensee, including but not limited to the construction, performance, or breach of this Agreement or any other agreement between TSC, Sublicensor, and/or Sublicensee, **whether entered into or occurring prior to, at the time of entering, during the term, upon, or after expiration or termination of this Agreement**[2], shall be submitted to a panel of arbitrators and not class arbitration under the Arbitration Act, and in accordance with the rules then obtaining of the American Arbitration Association, or any successor ("AAA") at its office nearest the principal executive office of TSC. . .. Doc. 8-2.

---

[1] North Florida is defined as a 33-county territory stretching from Escambia County to Flagler County (doc. 4-2).
[2] Emphasis added.

After entering into the Sublicense Agreement, Plaintiff then began to offer commercial real estate services as The Staubach Company-North Florida, and leased office space in Tallahassee to that end.

In October 2003, Plaintiff secured a contract with the State of Florida for "Real Estate Strategic Planning and Management" calling for Plaintiff to offer the state in-depth real estate consulting. Plaintiff sought assistance from Defendant's licensee, The Staubach Company-Northeast, through its subsidiary Staubach Governmental Services (collectively referred to as "SEMS") which specialized in providing property management services to governmental entities. To that end, Plaintiff and SEMS signed the Internal Revenue Sharing Agreement (doc. 8-3). Under the terms of the agreement, SEMS was to take the lead role in managing and operating the State of Florida account in return for 50% of the joint venture net income. The agreement also contained a dispute resolution clause stating, "Any disputes under this agreement shall be resolved under the dispute resolution methods outlined in the Staubach Cross Selling Guidelines."[3] Doc. 8-3. Section 1H describes the following procedure:

> At any time a member of the Leadership Council may call an arbitration meeting consisting of three Council members (the Arbitration Committee):
>
> 1. The current Leadership Council President (unless he/she is involved in the dispute).

---

[3] These methods are outlined on Page 28 in Section 1H of the January 2007 Cross Selling Guidelines (doc. 8-7).

>   2. Two other voting Leadership Council members, one each selected by the members involved in the dispute.
>
>   Each member involved in the dispute shall submit written documentation supporting his or her claim to the President of the Leadership Council. The Leadership Council President shall distribute the documents to the other members of the committee, as well as the regions involved in the dispute. The two regions have 24 hours to rebut the documentation via email to the three arbitrators.
>
>   After review of the supporting documentation, the Arbitration Committee shall vote and a majority vote shall rule.

Plaintiff grew increasingly unhappy in its relationship with FH and SEMS and left the Staubach family of companies in March 2006. In October 2006, Plaintiff and FH concluded the Separation Agreement which allowed FH to retain control of the State of Florida contract in return for, among other considerations, FH's assumption of the remaining rent due on Plaintiff's office lease. The Separation Agreement did not include an explicit dispute resolution clause.

Plaintiff has filed suit against the Staubach Company and alleges six counts in its complaint (doc. 4-2), five of which remain the subject of the present action. Counts II and III allege that Defendant, through its licensee, FH, breached the separation agreement by refusing to assume the obligations of Plaintiff's office rental. Counts IV, V, and VI allege that Defendant, through its licensee, SEMS, breached the Internal Revenue Sharing Agreement by failing to adequately perform, and that this failure breached the implied covenant of good faith and fair dealing between the parties and is also a violation of the Florida

Deceptive and Unfair Trade Practices Act[4]. Plaintiff filed its suit in state court, but Defendant removed the action to this Court based on diversity of citizenship of the parties (doc. 1).

**II. Legal Standard**

Agreements involving interstate commerce and containing arbitration clauses are governed by the FAA. Bullard v. Capital One, F.S.B., 288 F. Supp. 2d 1256, 1257-58 (N.D. Fla. 2003). By its terms, the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. § 3). The FAA's strong pro-arbitration policy does not, though, extend to those who have not clearly agreed to arbitrate. Volt Info. Sciences, Inc. v. Bd. of Trs. Of Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989). See also Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52 (1995).

The Eleventh Circuit has prescribed a two-step inquiry to determine the propriety of a motion to compel arbitration. Klay v. All Defendants, 389 F.3d 1191 (11th Cir. 2004). The first step is to determine whether the parties agreed to arbitrate the dispute. Id. at 1200. (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymoth, Inc., 473 U.S. 614, 626 (1985)). The second step is to

---

[4] Fla. Stat § 501.204

determine whether "legal constraints external to the parties' agreement foreclose[s] arbitration." Id. (citing Mitsubishi Motors Corp., 473 U.S. at 628).

**III. Analysis**

Counts II and III, concerning FH's assumption of Plaintiff's office rental obligations, arise out of the same set of agreements and thus will be analyzed together. Plaintiff argues that these claims arise out of the Separation Agreement which did not contemplate arbitration and contained a merger clause superseding all prior agreements between the parties. As evidence of this, Plaintiff points to the lack of an arbitration provision in the Separation Agreement as well as other provisions in that agreement which might be read as envisioning litigation. Defendant, on the other hand, contends that the arbitration provision in the Sublicense Agreement survives the termination of that agreement by the merger clause and is broad enough to cover a dispute arising out of the Separation Agreement. This Court agrees.

The instant case involves a dispute arising out of an ongoing business relationship wherein multiple agreements were executed between the parties with some agreements containing broad arbitration provisions and other failing to do so. In similar situations, courts have held that if the agreements were closely related to one another (with doubts construed in favor of arbitration), and there was clear language encompassing other agreements, the arbitration clause in one agreement should be read to cover the others. See e.g. NRP Group, Inc. v.

Hydropress, LLC, 2007 WL 201259 at * 3-4 (S.D. Fla. Jan. 24, 2007); Associated Brick Mason Contractors of Greater N.Y., Inc. v. Harrington, 820 F.2d 31, 35-36 (2d Cir. 1987). As to what qualifies as a broad arbitration clause, the Supreme Court has defined "arising out of or relating to" as a broad arbitration clause. Prima Paint Corp. v. Floor & Conklin Mfg. Co., 388 U.S. 395, 398 (1967).

The arbitration clause in the Sublicense Agreement includes the "arising out of or relating to" language and is thus a broad clause. Moreover, the Separation Agreement is, on its face, closely related to the Sublicense Agreement as it arises out of the same business relationship and terminates that very agreement. Plaintiff's argument that the Separation Agreement's merger clause puts that agreement beyond the reach of the arbitration clause of the Sublicense Agreement is unpersuasive. The language of the merger clause clearly reads in relevant part that, ". . . all provisions intended to survive the termination of [the Sublicense Agreement] shall survive." Doc. 8-4. The clear language of the arbitration provision of the Sublicense Agreement encompasses any dispute arising out of any agreement between the parties including those that arise "upon, or after expiration, or termination of this Agreement . . . . " Doc. 8-2. Because the Sublicense Agreement's arbitration provision is broad, closely related to the Separation Agreement, and has clear language encompassing other agreements, it applies to Counts II and III of the complaint, and thus those claims must be submitted to arbitration as provided for in the Sublicense.

Additionally, Plaintiff's principal, Leroy Collins Proctor ("Proctor"), claims that at the time he signed the Separation Agreement he did not intend or understand that the arbitration clause of the Sublicense Agreement would survive and that the arbitration provision is therefore procedurally unconscionable. The question of procedural unconscionability is governed by state law. Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987) (citations omitted). A procedural unconscionability defense requires the Court to consider issues such as the relative bargaining power of the parties and their abilities to know and understand the disputed contract terms. Orkin Exterminating Co. v. Petsch, 872 So. 2d. 259, 265 (Fla. 2d DCA 2004).

Proctor had conducted high-level negotiations for months before signing the Sublicense Agreement with FH. He ran a successful commercial real estate brokerage in Tallahassee while he waited to finalize the Sublicense Agreement. Presumably he possessed the education and experience necessary to achieve a level of success in the industry to allow him to leave Atlanta and strike out on his own in the first place. Additionally, his desire to attach a visible and popular brand to his brokerage indicates a level of business sophistication that would necessarily entail experience with commercial contracts. Therefore, the Court finds that Proctor knew and understood the plain language of the Sublicense Agreement which clearly indicated that the arbitration provision was intended to apply to any dispute between the parties including those that might have arisen

after the expiration or termination of the Sublicense Agreement, and that the merger clause of the Separation Agreement preserved such clauses that were intended to survive the Sublicense Agreement. Since there was an agreement to arbitrate and no legal constraints external to the parties' agreements to foreclose arbitration, Defendant's motion to compel arbitration with respect to Counts II and III will be granted.

Counts IV, V, and VI arise out of the same agreement and will be analyzed together. There is no question that the parties agreed to abide by Section 1H in the Revenue Sharing Agreement, thus questions of procedural and substantive unconscionability are not at issue. At issue is whether the parties agreed to "arbitrate" when they signed the Revenue Sharing Agreement which refers to the dispute resolution mechanism of the Cross Selling Guidelines. Arbitration is not expressly defined by the FAA nor has the Eleventh Circuit addressed the issue. Therefore, this Court looks to the Third Circuit's formulation as have other courts deciding this very issue.

"[T]he essence of arbitration [is] when the parties agree to submit their disputes to it, they have agreed to arbitrate these disputes through to completion, i.e. to award made by a third party arbitrator." Advanced Bodycare Solutions LLC v. Thione Int'l., Inc., 514 F.Supp.2d 1326, 1333 n. 4 (S.D. Fla. 2007) (quoting Harrison v. Nissan Motor Corp., 111 F.3d 343, 350 (3d Cir. 1996)). Inherent to the notion of agreeing to arbitrate these disputes through to completion is that

such procedures must be mandatory and exclusive. Dluhos v. Strasberg, 321 F.3d 365, 372 (3d Cir. 2003) (internal citations omitted) See Also Brennan v. King, 139 F,3d 258,266 (1st Cir. 1998); Advanced Bodycare, 514 F.Supp.2d at 1332.

Section 1H is not arbitration within the purview of the FAA and thus Defendant's motion will be denied with respect to Counts IV, V, and VII. Neither the plain language of the Revenue Sharing Agreement nor Section 1H indicates that the dispute resolution mechanism in question is either mandatory or exclusive. There is nothing in the language of Section 1H that precludes Plaintiff from filing suit or seeking alternative methods of dispute resolution. Defendant characterizes the phrase "shall be resolved" in the Revenue Sharing Agreement as indicating that the Section 1H mechanism is mandatory and exclusive. A plain reading of the agreement does not sustain that conclusion. The dispute resolution clause merely acts as a reference to Section 1H, and Section 1H does not describe a mandatory and exclusive process. Moreover, it would appear as if the Section 1H mechanism was not readily available to the Plaintiff as it only provides for a member of the Staubach Leadership Council to call for an arbitration meeting, and according to Plaintiff's affidavit attached to Plaintiff's surreply (doc. 20-2), Plaintiff was not a member of the Staubach Leadership Council.  Plaintiff's argument is well taken: if Defendant had envisioned the Revenue Sharing Agreement to include an arbitration provision, it could have

drafted the document to provide for a mandatory and exclusive process available to all parties, as it did in the Sublicense Agreement.

Defendant relies on several cases that have upheld internal dispute resolution mechanisms as arbitration. See e.g. Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1367 (11th Cir. 2005); BDO Seidman, LLP v. Bee, 970 So. 2d 869, 876 (Fla. 4th DCA 2007); BDO Seidman, LLP v. Bloom, No. 600404/2004, 2004 WL 2659987 at *5 (N.Y. Sup. Ct. Oct. 6, 2004). However these cases are distinguishable from the instant case. They all involve disputes regarding wrongful termination and arbitration clauses that were written in employment contracts. There was no question that agreements in those cases provided for a mandatory and exclusive process whereas the agreement at issue in this case is an example of a discretionary alternate process. Here, the provision does not provide for a method of dispute resolution readily available to Plaintiff nor does it foreclose any alternate avenue for Plaintiff to try and resolve its claims. It is questionable, moreover, whether Section 1H provides for arbitration before neutral third parties, but it is not necessary to address this issue. Because the procedure of Section 1H is neither mandatory nor exclusive, it is not arbitration that can be enforced under the FAA.

ORDERED AND ADJUDGED:

1.      Defendant's motion to compel arbitration and stay litigation pending arbitration (doc. 8) is **granted** with respect to Counts II and III of Plaintiff's

complaint (doc. 4-2).

      2.      Defendant's motion to compel arbitration (doc. 8) is **denied** with respect to Counts IV, V, and VI of Plaintiff's complaint (doc 4-2). On or before July 22, 2008, the parties should consider and submit a written statement to the Court on their respective positions on whether Counts IV, V, and VI should be stayed pending arbitration of Counts II and III.

      DONE AND ORDERED this ninth day of July, 2008.


          *s/ Stephan P. Mickle*
          Stephan P. Mickle
          United States District Judge